**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VIATECH TECHNOLOGIES, INC., | ) Civil Action No.: 19-11177 |
| Plaintiff, | ) |
| | ) |
| v. | ) **COMPLAINT AND** |
| | ) **DEMAND FOR JURY TRIAL** |
| ADOBE INC., | ) |
| | ) |
| Defendant. | ) |

<u>**COMPLAINT FOR PATENT INFRINGEMENT**</u>

Plaintiff ViaTech Technologies, Inc. ("Plaintiff" or "ViaTech"), through its attorneys, for its

Complaint against Adobe Inc. ("Defendant" or "Adobe"), alleges as follows:

<u>**THE PARTIES**</u>

1.     Plaintiff is a corporation organized and existing under the laws of the State of

Delaware having a place of business at 1136 Ashbourne Circle, Trinity, Florida 34655, and has a

registered agent in the District at 45 Bristol Drive, Suite 101, South Easton, Massachusetts 02375.

2.     Defendant Adobe is a corporation organized and existing under the laws of the State

of Delaware and having a place of business at One Newton Place, 275 Washington Street, 3rd

Floor, Newton, Massachusetts 02458.

<u>**JURISDICTION AND VENUE**</u>

3.     This action arises under the patent laws of the United States, Title 35 of the United

States Code. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and

1338(a).

4.     Defendant Adobe is subject to this Court's specific and general personal jurisdiction consistent with due process and the Massachusetts Long Arm Statute, Gen. Laws. ch. 223A, § 3.

5.     Venue in this Judicial District is proper under 28 U.S.C. § 1400(b) because Defendant has committed acts of infringement and has a regular and established place of business within this District.

6.     Adobe is registered to do business in the Commonwealth of Massachusetts, and has appointed Corporation Service Company, 84 State Street, Boston, Massachusetts 02109, as its registered agent.  Adobe, either directly, or indirectly through its distribution network, has transacted and/or continues to transact business in Massachusetts, and has regularly solicited and continues to regularly solicit business in Massachusetts.

7.     Adobe has also engaged in substantial activity within the Commonwealth and derives substantial revenue from goods or services provided to individuals in Massachusetts.

8.     Adobe maintains at least two offices within this District.  The Adobe Newton Office is located at Newton Corner, One Newton Place, 275 Washington Street, 3rd Floor, Newton, Massachusetts 02458.  Adobe boasts that the Adobe Newton Office is "home to a wide variety of employees, including the Adobe Acrobat and Adobe Campaign teams."[1]  Adobe also maintains an office at One Broadway, Cambridge, Massachusetts 02142.

9.     Adobe also owns and operates its online store, including as integrated into its Adobe Creative Cloud application and related functionality embedded into many of its software products, which offers for sale, and sells, Adobe software products and services to customers within this Judicial District, and offers technical support to Adobe customers within this Judicial District.

---

[1] *See* Welcome to Adobe Newton!, *at* https://spark.adobe.com/page/OTwnf/ (last visited May 17, 2019).

10.     Adobe has also committed tortious acts within Massachusetts, and the causes of action set forth in this Complaint arise from those acts.  Adobe develops, manufactures, distributes, and licenses software products having anti-piracy features, which infringe the patent asserted in this action, and which are, and have been, offered for sale, sold (directly or through Defendant's online store and distribution network), purchased, and used in this Judicial District.  Adobe, directly or through its distribution network, also places infringing products within the stream of commerce, with the knowledge and/or understanding that such infringing products will be sold and/or used in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### About ViaTech

11.     ViaTech, Inc. was formed in January 1995 as a Massachusetts Corporation located in Natick, Massachusetts.  In approximately March 2000, ViaTech Technologies, Inc. was formed as a Delaware corporation.  Thereafter, ViaTech, Inc. merged into ViaTech Technologies, Inc.

12.     At its inception, ViaTech provided software and services for computer aided design (CAD) applications.  In order to enforce the terms of its software licenses with its customers and protect its products from piracy, ViaTech explored options for securing computer software and other digital content.  After surveying the available options in the marketplace, ViaTech realized that there was significant potential for improvement.  Indeed, at the time, many tools relied on physical protection schemes.  For example, then state-of-the art solutions included hardware "dongles" that proved to be expensive, unwieldy, and unfriendly.  Other solutions were tied to the use of a particular floppy disk, or were limited to enterprise solutions and deployments.  From its office in Natick, Massachusetts, ViaTech set about to create improved tools for controlling the licensing and management of digital assets.  As described below, ViaTech ultimately applied for

and received patents in the United States and in Europe that described and claimed aspects of ViaTech's innovations.

13.     ViaTech first set about the development of tools for software licensing and management.  Thereafter, ViaTech developed tools for software distribution, including tools for wrapping digital content developed or published by third parties.  Leading into 2000, ViaTech added software e-commerce tools and solutions to its product and service offerings, which allowed for online sale and distribution of digital content.

14.     ViaTech's licensing and management tools were adopted by numerous entities, including for business-to-business and business-to-consumer applications.  For example, as announced in a December 30, 1999 press release, the superstar Warner Elektra recording artist Phish announced that it would offer selected tracks from the band's New Year's Eve concert for sale via the Internet after each set, spurred by the availability of ViaTech's eLicense System, which enabled the sale of selected music tracks in secure MP3 format and a try-before-you-buy feature. As other examples, ViaTech's products and technology were licensed for use by the industry's largest software resellers and publishers, including Digital River and SystemSoft.

15.     ViaTech continued to improve its products and services, including to keep pace with advances in technology, the rising importance (and risk) of Internet-based software distribution, and evolving methods of software piracy and license circumvention.

16.     Even today, ViaTech customers continue to use ViaTech's eLicense System to protect and distribute their digital properties.  ViaTech's current customers include independent software developers, PC game developers, and digital publishers, among others.  ViaTech's infrastructure has been used to issue millions of software licenses, and ViaTech processes thousands of licenses per month in an array of currencies for customers and end-users across the

globe. ViaTech continues to update its software and backend systems as needed to support its customers and their needs.

17.     In addition to its Florida location, ViaTech's connections to Massachusetts continue. The '567 Patent lists three named inventors:  Robert J. Doherty, Peter L. Tierney, and Marios Arnaoutoglou-Andreou, each of whom has and continues to reside in Massachusetts.  Mr. Andreou continues to support ViaTech's products and technology, and acts as its CTO on a contract basis. Discoverable materials and likely witnesses are located within this District.

### The Patent-in-Suit

18.     ViaTech applied for its U.S. Patent No. 6,920,567, entitled "System and Embedded License Control Mechanism for the Creation and Distribution of Digital Content Files and Enforcement of Licensed Use of the Digital Content Files" ("the '567 patent," attached as **Exhibit A**) in April of 2000, and the patent was duly and legally issued by the United States Patent and Trademark Office on July 19, 2005.  The '567 patent is entitled to the benefit of Provisional Application No. 60/128,152, filed on April 7, 1999.  ViaTech is the owner by assignment of all rights, title, and interest in and to the '567 patent, including the right to sue for past infringement.

19.     ViaTech's patented technology generally relates to methods and systems for controlling the use of files containing digital content, including system and license control mechanisms for use in creating, accessing, installing and distributing files containing digital content and for enforcing the licensed use of digital content files.

### Adobe's Infringing Technologies

20.     As described herein, Adobe employs or distributes at least two protection technologies that infringe the '567 patent:  (a) the Software Activation Technologies applied to

software products that Adobe sells to curb piracy and unlicensed use of Adobe software, and (b) Flash Access technology which allows Adobe or third parties to protect content of their choice.

**Adobe Software Activation**

21.     Adobe has designed its products to require product activation in order to function. In other words, a customer is unable to make full use of Adobe's software applications unless and until the customer activates the software via Adobe's Software Activation technologies.  The inclusion and use of such technology is instrumental to Adobe's download and subscription distribution models and the presence and operation of such technology is a foregone conclusion by virtue of Adobe's integration of the activation technologies into its offerings of software products. Indeed, Adobe's Software Activation technology continues to monitor end users' use of Adobe's software applications to ensure compliance with Adobe's license terms—even after the applications are initially installed.

22.     According to Adobe's support documents: "Activation validates your software license to prevent fraud and abuse of Adobe products and services.  The activation process sends information to Adobe at various times, such as at download, installation, uninstallation, serialization, launch, and during update checks for Adobe software.  Adobe may also use this information to provide you with license renewal options and to help us understand how you use our products."[2]  Adobe further discloses that the Activation process applies to "All Apps."

23.     Activation is not an optional feature, nor is its invocation occasional.  Rather, the activation process is required in order to utilize its applications.  For example, Adobe states:

---

[2] Activate and Deactivate Adobe Products, *at* http://helpx.adobe.com/x-productkb/policy-pricing/activation-deactivation-products.html (Last published April 2, 2019).

"Activation connects an app to a valid user license. You need to activate your apps in order to use them after purchasing a plan."[3]  "Activation is a required process by which Adobe validates that your software is genuine and being used as allowed by your product license agreement. It is intended to protect both your rights as a consumer and Adobe's rights as a software developer. Activation also helps confirm that the software you bought is not counterfeit."[4]  Typically, activation occurs automatically at runtime, with the software prompting the user to carry out the needed activation steps to enable use of the product.  Additionally, Adobe provides graphical user interface elements to invoke and interact with the Adobe Activation features.  For Adobe Creative Cloud applications, the activation technology is accessible through the Creative Cloud desktop application by signing into an associated Adobe account to activate based on a purchased subscription.  The Creative Cloud desktop application likewise provides an indication of the products that have been purchased and licensed for use by the customer, further providing options to obtain trial or full licenses to various Adobe software products.  Alternatively, activation technology is accessible through the Help menu in Adobe software products, including those within Adobe's Creative Cloud family of applications (via the Sign In or Sign Out selections).  For Acrobat DC, similar Sign In / Sign Out options are provided in the Help menu.  For earlier applications, including Acrobat XI, and those included in the Creative Suite 6 family of software products, the applications' Help menus provide options to Activate or Deactivate the products.  Moreover, Adobe has designed and deployed its products in a manner such that the Adobe software

---

[3] Activate and Deactivate Adobe Creative Cloud Apps, *at* https://helpx.adobe.com/download-install/using/activate-deactivate-creative-cloud-apps.html (Last published Apr. 2, 2019).

[4] Adobe Acrobat 2017 FAQ, *at* https://helpx.adobe.com/acrobat/faq-acrobat-2017.html (Last published June 15, 2017).

automatically runs software code to verify that activation has occurred in accordance with the licensing and use policies applicable to that product.

24.     As described in additional detail below, Adobe causes information related to licensing and activation to be stored locally on an end-user's computer.  This is necessary, for example, to enable use of the software while it is offline (i.e., in a manner in which the software does not, or is unable to, communicate with Adobe's servers when run).  For example, Creative Cloud monthly subscribers may utilize the software in offline mode for up to 30 days; annual subscribers are afforded up to 99 days of offline use.[5]  These aspects demonstrate that the license control mechanism is present in the Adobe digital content file and is locally operative.  Depending on the product, Adobe's licensing policies permit use of a product in a trial mode, or in an "unactivated" state for a limited period of time.  Thereafter, continued use requires that the product be activated (or, as the case may be, to purchase a non-trial license or subscription license, which is thereafter verified through the activation process).

25.     In addition to verifying the existence of a valid license for use of the Adobe application, Adobe Software Activation technology associates the software with a particular computer, thus disallowing the activation or use of Adobe software on more end-user systems than is permitted by Adobe's licensing policies.

26.     Adobe utilizes Software Activation technologies to secure a litany of Adobe Products.  As discussed below, Adobe includes an embedded file access control mechanism that includes at least the Adobe AMT Library (as implemented in amtlib.dll / amtlib) in numerous Adobe products in order to protect those software products and ensure compliance with Adobe's

---

[5] Internet Connectivity, Offline Grace Period, and Reminders, *at* https://helpx.adobe.com/creative-cloud/kb/internet-connection-creative-cloud-apps.html (Last published Jan. 25, 2018).

licensing policies.  On information and belief based on a reasonable investigation of publicly

available resources, the AMT Library protects at least the Adobe products in Adobe Creative Cloud

(CC) 2019 and earlier, Adobe Document Cloud (DC) 2019 and earlier, Adobe Acrobat 2017,

Adobe Creative Suite (CS) 6, Adobe Acrobat XI, and other Adobe products in a manner that

infringes the '567 patent.

### Adobe Access

27.     Not only does Adobe utilize tools to protect its own digital content (i.e., its software

applications) from unauthorized use, Adobe also offers tools that allow content owners to protect

their digital content (e.g., music and movies) from unauthorized use (e.g., uses that are not

consistent with an end user's license rights).  In particular, Adobe offers the Adobe Access suite of

Digital Rights Management (DRM) products and tools.

28.     According to Adobe's marketing materials, such as the Adobe Access Version 4.0

Overview, "Adobe Access lets content owners and distributors control how and where their content

can be distributed and experienced, providing end-to-end protection throughout the content

lifecycle.  It encrypts Flash FLV and F4V video files, which can then be streamed or downloaded to

Microsoft® Windows®, Apple® MAC OS®, Linux® and Android® platforms, and enforces

models such as online video rental.  Consumers enjoy high quality content at their convenience,

whether they are online or offline."[6]  Furthermore, "Adobe Access is a flexible platform that

enables content owners to protect their content and maintain control over distribution.  Content

owners can protect and manage their rights by creating licenses for each digital media file, ensuring

that a wide variety of the highest-quality content is made available to consumers."

---

[6] Adobe Access Version 4.0 Overview, *available at*
https://www.adobe.com/support/adobeaccess/pdfs/server/AdobeAccess_4_Overview.pdf (April
2014).

29.     Adobe Access allows for the definition of polices that define use rules, including how end users may use protected content.  Those policies are defined independently of the content that is protected.  Policies are then bound to content files via a license.  Adobe Access offers a variety of policies, including to ensure that protected content is available for a limited period of time, or on a limited number of devices.

30.     Adobe Access technology may deployed, for example, in Flash Player or the Adobe AIR environments.  Each of Adobe Flash and Adobe AIR enforce the policies defined by a content owner via Adobe Access.

31.     In general, Adobe Access DRM technology makes it possible to protect and securely deliver video and audio content for playback on an array of consumer devices, including personal computers, mobile and connected TV devices.[7]  Adobe Access DRM may be used to secure content that is streamed online, or content that is downloaded or stored on a user system.

32.     Adobe Access includes a variety of components, including Adobe Access Packager Server, Adobe Access License Server, and Adobe Access clients that are bundled components of Flash Player and AIR (for example).

33.     Adobe advertises that Adobe Access DRM provides industry-standard cryptography and robust tamper resistance that provides secure playback of content; persistent protection regardless of where the content is stored and independent of transmission method; anonymous or authenticated license acquisition; support for purchase, pay-per-view, rental, subscription, or ad-

---

[7] *E.g.*, Adobe Access White Paper, Offline Viewing using Adobe® Access Packager and License Server, *at* https://www.adobe.com/content/dam/acom/en/devnet/video/pdfs/offline-viewing-adobe-access.pdf (2012).

based; support for standard A/V formats, including H.264/MP4, AAC, FLV; selectable output control to specify content protection requirements; restricting video playback only to devices that meet specific criteria; limiting playback for each piece of content to specific applications; and individualization, diversification, revocation, and renewability of content licenses.[8]

34.     A "crux" of the Adobe Access protection scheme includes what Adobe calls "individualization," which is " the process by which Adobe Access creates a unique Machine Identity for your client machine, as well as a Secure Store for protecting licenses and other sensitive assets."[9]  Through individualization, i.e., fingerprinting of the user system, licenses are bound to a specific machine identity so that only authorized devices may consume and use content licenses. Individualization takes place the very first time that Adobe Access content is played; thereafter the individualization information is locally stored on a user device, such as in the form of a "machine certificate." Adobe Access components can detect changes to an end-user machine and/or playback environment, preventing access to content unless and until a new license is obtained.

35.     On information and belief based upon publicly available information, the infringing features of Adobe Access DRM technology are also included within the Adobe Primetime ecosystem.  For example, Adobe's support site lists and discusses "Adobe Access DRM / Primetime DRM" interchangeably and indicates that Adobe Primetime DRM was formerly known as Adobe Access.[10]  Adobe also provides tools to migrate Adobe Access Flash-based SDK

---

[8] *Id.*

[9] *E.g.*, When is Individualization Triggered?, *at* https://forums.adobe.com/thread/1189199 (Adobe Staff author) (Apr. 15, 2013).

[10] *E.g.*, "Adobe Access DRM / Primetime DRM Community Forum" *at* https://forums.adobe.com/community/adobe_access ("This forum is only for discussing Video Content Protection using Primetime DRM & Adobe Access DRM."); "Adobe Primetime Cloud

deployments to Primetime Javascript-based SDK deployments, and encourages and instructs its customers to do so.[11]

## Adobe's Infringement of ViaTech's '567 Patent is Willful

36.     Since at least April 10, 2015, Adobe has had actual notice of ViaTech's '567 patent, and actual notice that the Adobe Activation and Adobe Flash Access technologies infringe the '567 patent because ViaTech provided Adobe with claim charts documenting Adobe's infringement. And a review of public documents related to Adobe's own patent prosecution undertakings reveals that Adobe was aware of the '567 patent even earlier.  Indeed, the '567 patent was cited by Adobe or the USPTO Examiner during the prosecution of at least three of Adobe's own patent applications related to digital rights management, activation, and software licensing technologies.  As described herein, Adobe was notified of its infringement and continued to infringe thereafter as contemplated by 35 U.S.C. § 287.

37.     On April 10, 2015, Michael J. Lennon of the Kenyon & Kenyon law firm, acting as counsel of ViaTech, sent a notice letter to Michael Dillon, the Senior Vice President, General Counsel, and Corporate Secretary of Adobe, via Federal Express (the "Notice Letter") that documented Adobe's infringement of the '567 patent.  A copy of the '567 patent and exemplary claim charts were included with the Adobe Notice Letter.

---

DRM Service and Hardware DRM Support," Adobe Digital Media Blog, *at* https://blogs.adobe.com/digitalmedia/2013/09/adobe-primetime-cloud-drm-service-and-amd-hardware-drm-support/ ("Today, we announced two exciting new features to the Adobe Primetime DRM (formerly Adobe Access) offering.") (Sept. 24, 2013).

[11] *E.g.*, "Moving Beyond Flash: Providing a Better TV Everywhere Authentication Experience with the New JavaScript SDK 3.0," Adobe Blog, *at* https://theblog.adobe.com/javascript-sdk-3-0/ (Aug. 17, 2017).

38.    The Adobe Notice Letter informed Adobe that the activation features used to protect the Adobe Creative Cloud, Acrobat, and Creative Suite products infringed several claims (e.g., claims 1, 2, 3, 4, 5, 7, 13, 14, and 15) of the '567 patent.  In support thereof, a 102-page exemplary claim chart was attached, providing sufficient detail to provide Adobe with actual notice that its activation technologies (and subsequent improvements thereto) infringed the '567 patent.

39.    The Adobe Notice Letter also informed Adobe that the Adobe Access digital rights management platform included features, including for controlling access to digital content, that infringed several claims (e.g., 1, 2, 3, 4, 8, 9, 10, 11, 12, 13, 14, and 15) of the '567 patent.  In support thereof, a 99-page exemplary claim chart was attached, providing sufficient detail to provide Adobe with actual notice that its Adobe Access technology (and subsequent improvements thereto) infringed the '567 patent.

40.    On information and belief and based upon a reasonable inquiry, Adobe never responded ViaTech's Notice Letter.

41.    Adobe was also notified of the '567 patent at least as early as 2011, and notified that Adobe infringed one of more claims of the '567 patent even before receiving the Adobe Notice Letter described above.  For example, Adobe learned of the '567 patent and the scope of the patent's claims in connection with Adobe's own patent prosecution activities.  On information and belief, Adobe's prosecution activities arose from or were related to Adobe's efforts to secure patent claims that were practiced by one or more of the Adobe products or technologies accused of infringement in this action, placing Adobe on notice of the patent and that its products or technologies infringed the '567 patent.

42.    In connection with Adobe's prosecution of U.S. Patent Application No. 13/005,823, the face of which discloses its applicability to the Adobe Flash Access technology accused herein of

infringement, Adobe disclosed that ViaTech's '567 patent was pertinent prior art to Adobe's then-pending claims in an information disclosure statement filed with the USPTO on or around January 18, 2011.

43.     In connection with Adobe's prosecution of U.S Patent Application No. 12/622,031, on or around August 27, 2013, the USPTO Examiner cited ViaTech's '567 patent as pertinent prior art to Adobe's then-pending claims that related to software activation and enabling technologies. Indeed, the Examiner cited the '567 patent as Section 102(b) art and rejected certain of Adobe's then-pending claims as anticipated, and rejected other claims as obvious in view of the '567 patent in combination with other references.

44.     In connection with Adobe's prosecution of U.S Patent Application No. 12/622,083, on or around March 2014, the USPTO Examiner cited ViaTech's '567 patent as pertinent prior art to Adobe's then-pending claims that related to software activation and enabling technologies.

45.     In spite of its knowledge of the '567 Patent and its pertinence to Adobe's products and technologies dating to at least 2011, and in spite of its receipt of the Notice Letter with detailed claim charts, Adobe continued its infringement unabated.  Indeed, as described herein, Adobe did not discontinue its infringing activities—it doubled down.  Adobe deployed its activation technologies on an even wider scale.  Adobe continued to offer the Adobe Access tools and to provide instructions regarding the use of those tools in a manner that constituted infringement.  On information and belief, including based on comments by Adobe personnel in Adobe's product forums and blog posts, the infringing aspects of Adobe Access were subsequently incorporated into Adobe PrimeTime technology as well.

46.     Adobe's extended and willful infringement harmed ViaTech's standing in the marketplace.

47.     Adobe's extended and knowing infringement constituted egregious misconduct that constitutes willful infringement, and which supports an award of enhanced damages.

**FIRST COUNT**
**(DIRECT AND INDIRECT INFRINGEMENT OF U.S. PATENT NO. 6,920,567 UNDER**
**35 U.S.C. § 271(a), (b) and (c) - ADOBE ACTIVATION TECHNOLOGY)**

48.     ViaTech incorporates by reference all of the allegations set forth in Paragraphs 1-47 of this Complaint as though fully set forth herein.

49.     Adobe has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '567 patent (including without limitation claim 1) in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, selling, and/or importing, in this District and elsewhere in the United States, Adobe's Software Activation technologies, and/or Adobe Software products that include or incorporate such technologies.

50.     Adobe's Software Activation technologies infringe at least claim 1 of the '567 patent.  The Adobe Product files for use on at least computers running Windows or MacOS operating systems (e.g., an Adobe application installer file, and an Adobe application once installed) are "digital content files" in accordance with the '567 claims.  Adobe applications may be downloaded from Adobe's website, downloaded from Adobe via the Creative Cloud desktop application, or via Adobe's software update mechanisms.  Representative accused products include those in the Adobe Creative Cloud families (including Creative Cloud 2019 and earlier), the Adobe Document Cloud ("DC") families (including Document Cloud 2019 and earlier and Acrobat DC), Acrobat 2017, and Adobe Creative Suite ("CS") 6 (i.e., the Adobe Products).

51.     The Adobe Product files include a license control mechanism for controlling their licensed use.  The license control mechanism includes a combination of DLLs and services that are part of the Adobe Product file that is subject to license control, and also include applicable supporting applications (i.e., the Adobe Creative Cloud desktop application).  An embedded file

access control mechanism is embedded in the Adobe Product file, and includes a license functions

mechanism that includes at least the "AMT Library," for example as implemented in "amtlib.dll"

(Windows) or "amtlib" (MacOS).

52.      A license monitor and control mechanism in the Adobe Product files communicates

with a dynamic license database and monitors use of the Adobe Product file to determine whether a

use of the Adobe Product file complies with the license defined in the dynamic license database.

For example, in Creative Cloud 2019 applications, the dynamic license database includes at least

the Windows Credential Storage or MacOS Keychain, which stores license information related to

the Adobe Product files.  On versions of Adobe Product files predating Creative Cloud 2019,

license information may also be stored in files on the local machine, including for example those

stored in the SLStore and SLCache directories associated with the Adobe Product files.  The offline

capabilities, for example, demonstrate that file access control mechanism is embedded in the Adobe

Product file(s).

53.      A license control utility provides communications between the user system and an

external system to communicate license definition information between the user system and the

external system.  The license control utility includes, for example, the AMT Library, which

provides for communications with external systems (i.e., Adobe licensing and activation servers).

Although not subject to public inspection, the AMT Library includes strings representing

communications with a server, e.g., SLCoreServiceGetLicenseServerData.  AMT configuration

files associated with an Adobe Product file include configuration information for communication

with external systems in accordance with the claims of the '567 patent.  Adobe-provided technical

documentation likewise indicates that activation requires communication with external systems,

including for example "*.adobe.com," "*.licenses.adobe.com."[12]  As described above, Adobe documentation states that the activation steps are invoked each time that an Adobe Product file is used, and that the Adobe Activation technologies include an offline mode wherein license verification occurs locally in instances where connectivity to external systems is interrupted.

54.     A graphical user interface associated with the license control utility provides communication between a user and user accessible functions of the license function mechanism. For example, dialog boxes prompt users with "Sign In Required" to use the product and access subscription or membership information.  As a further example, dialog boxes provide a user with information regarding the number of days remaining in a product trial or before activation is required, and allows a user to continue or to activate.  As a further example, applicable graphical user interface elements are incorporated into the Adobe Product(s), such as via the help menu.  As another example, the Creative Cloud desktop application provides a graphical user interface for user accessible functions of the license function mechanism.  This functionality is present whether installed on a Windows-based or MacOS-based system.

55.     The dynamic license database is associated with the Adobe Product file for storing information controlling operations of the file access control mechanism and license information controlling licensed use of the digital content.  By way of example, the dynamic license database credentials or files include strings that represent the associated Adobe Product file.  Likewise, although not publicly documented or readily subject to inspections, the credentials stored therein change when a license is obtained for use of an Adobe Product that was previously in a "trial" mode.

---

[12] *See, e.g.*, Adobe Creative Cloud Network Endpoints, *at* https://helpx.adobe.com/enterprise/kb/network-endpoints.html (Last published Apr. 24, 2019).

56.     Adobe also indirectly infringes the '567 patent under 35 U.S.C. § 271(b) & (c) by actively inducing and contributing to the infringement by others.

57.     For example, Adobe actively induces infringement of at least claim 1 of the '567 patent, literally or under the doctrine of equivalents, by making, manufacturing, testing and otherwise using, licensing, selling and offering to sell, and distributing Adobe Product files that include the Software Activation technologies described above for installation and/or use by customers, distributors, and end users whose installation and/or use directly infringe one or more claims of the '567 patent.  Adobe encourages and instructs its customers and end users to obtain, install, configure, use, and activate the Adobe Products with knowledge that the induced acts constitute infringement.  For example, Adobe has been and is now intentionally requiring, instructing and directing its customers and end users of Adobe Product files, who purchase, subscribe to, use and/or otherwise implement those products in their respective systems to install the software and inevitably use the product activation features of those products in order for the software products to function properly.  For example, Adobe may condition the sale and/or use of any Adobe Product file on the presence, operation, and use of the Software Activation technologies described above.

58.     Adobe does the above with knowledge of the patented invention of the '567 patent, and knowing that, by doing so, the customers, distributors, and end users directly infringe.  Adobe possesses specific intent to encourage infringement by these entities and their customers. Adobe has control over the design and manufacture of the Adobe software products and services that incorporate the Software Activation features described above, and Adobe possesses specific intent to cause infringement by the use of these products as described in more detail above.  Adobe has control over the end-user license terms and provisions thereof, which require and obligate

customers, distributors, and end users to utilize the Adobe Activation technologies and Adobe Product files in a manner that Adobe knows is infringing.

59.     Adobe also contributes to the infringement of at least claim 1 of the '567 patent, literally or under the doctrine of equivalents, by making, manufacturing, testing and otherwise using, licensing, selling and offering to sell, and distributing Adobe Product files for installation and/or use by customers, distributors, and end users whose installation and use directly infringe one or more claims of the '567 patent.  Adobe encourages and instructs its customers and end users to infringe, with knowledge that the induced acts constitute infringement.  For example, Adobe has been and is now intentionally requiring, instructing and directing end users of its products who purchase, use, and/or otherwise implement those products in their respective systems to install the software and inevitably use the product activation features of those products in order for the software products to function properly.

60.     Adobe does the above with knowledge of the patented invention of the '567 patent, and knowing that, by doing so, the customers, distributors, and end users directly infringe.  Adobe knows that its Software Activation technologies are components used to practice the inventions of the '567 patent, and knows that these components are especially made and adapted for use in infringing the claims as described in more detail above. There are no substantial non-infringing uses for the Software Activation technologies in the Adobe Product files, nor are they staple articles of commerce.  Those components form a material part of the combination; they are required and control access to those products each time they are launched on a user's computer or other device and cannot be removed or bypassed by the customer or end user.

61.     Adobe's infringement of the '567 patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

62.     As a result of Adobe's infringement of the '567 patent, ViaTech has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Adobe's infringement, but in no event less than a reasonable royalty with interest and costs.

## SECOND COUNT
## (DIRECT AND INDIRECT INFRINGEMENT OF U.S. PATENT NO. 6,920,567 UNDER 35 U.S.C. § 271(a), (b) and (c) – ADOBE ACCESS AND RELATED TECHNOLOGIES)

63.     ViaTech hereby incorporates by reference the allegations set forth in Paragraphs 1-62 of this Complaint as though fully set forth herein.

64.     Adobe has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '567 patent in violation of 35 U.S.C. § 271(a), including claim 1 of the '567 patent, by making, using, offering to sell, selling, and/or importing, in this District and elsewhere in the United States, Adobe's Access digital rights management platform and related technology, included as used in the Adobe Flash, Adobe AIR, and, on information and belief, Adobe Primetime, product lines and ecosystems.

65.     A digital content file that has been protected by Access Packager may be downloaded, transferred, or stored on a user system with Flash Access capabilities (e.g., a Flash Player or AIR runtime), and constitutes a digital content file in accordance with the claims. According to Adobe's Access 4.0 Overview:  "Adobe Access is a flexible platform that enables content owners to protect their content and maintain control over distribution. Content owners can protect and manage their rights by creating licenses for each digital media file, ensuring that a wide

variety of the highest-quality content is made available to consumers."[13]  Policies define usage rules

that determine how consumers may use digital content files, and are bound to such content files via

a license.  As described in Adobe's product documentation above, the digital content of the claims

may include digital audio or video files, such as those encoded in FLV or F4V formats; Adobe

Access supports standard A/V formats including H.264/MP4, AAC, FLV.

66.     As described above, Adobe Access includes an embedded file access control

mechanism embedded in the digital content file, including a license monitor and control mechanism

communicating with a dynamic license database and monitoring use of the digital content by a user

to determine whether a use of the digital content by a user compiles with the license defined in the

dynamic license database.  An Adobe Access license is a data structure containing an encrypted key

used to decrypt content associated with a policy.  Licenses are generated by Adobe Access when the

consumer requests content, and are associated with and stored on the consumer's computer.

Licenses define the rights available to the consumer who downloads content. In order to view

content, the consumer must obtain a license.[14]  Adobe instructs its customers that the usage rules

supported by Adobe Access allow for several different business models, including pay-per-view,

movie rental, subscriptions, or ad-funded services.  Usage rules may be embedded within a content

file by Adobe Access during packaging, or by Flash Access Professional, or can be specified by the

License Server during license acquisition; the rules may include as examples specifying the number

of days that a license is valid once a consumer begins playback, and may further specify whether

---

[13] Flash Access documentation is available at
https://www.adobe.com/support/documentation/en/adobeaccess/.

[14] Adobe Access 4.0 Overview, at 2-3.

license caching is allowed.[15]  Licenses are automatically downloaded and stored in a secure

dynamic license database on the user system when content is purchased or rented;  Flash and AIR

applications save these licenses on the user system.  For example, Flash Access license files for

Flash Player are stored in the Flash Player preferences folder (including, for example,

APSPrivateData2 and NativeCache); for AIR-based applications, they are stored in the specific

application's folder in the AIR Encrypted Local Store (ELS) folder (including, for example,

subfolders APSPrivateData and APSPrivateData2).[16]  When there is an attempt to access a content

file, for example, embedded mechanisms monitor use to determine whether the attempted use

complies with the applicable policy.  For example, when the use is authorized, the NetStream object

dispatches a DRMStatusEvent object.  The DRMStatusEvent object holds related voucher

information, which identifies the user's policy and permissions, such as whether the content can be

made available offline or when the license expires.  The application can use this data to inform the

user of the status of their policy, such as by displaying the number of remaining days the user has

for viewing the content in a status bar.  If offline access is allowed, the voucher is cached, and the

encrypted content is downloaded to the user's machine and is made accessible for the duration

defined in the license caching duration.  The detail property in the event contains

"DRM.voucherObtained."  Vouchers may also be preloaded using the DRMManager class.[17]  An

---

[15] Adobe Access 4.0 Overview, at 6, 11.

[16] *E.g.*, Removing Adobe Flash Access Data Files, *at* http://helpx.adobe.com/x-productkb/multi/removing-flash-access-data-files.html (Last published Dec. 1, 2016).

[17]  "Understanding the Protected Pontent Workflow," Actionscript 3.0 Developer's Guide, *available at* http://help.adobe.com/en_US/as3/dev/WS5b3ccc516d4fbf351e63e3d118666ade46-7ce3.html (last updated Oct. 9, 2017).

Adobe Access License Server is designed to issue licenses to user systems to access content files via FlashPlayer or Adobe AIR.

67.     A license control utility provides communications between a user system and an external system to communicate license definition information between the user system and the external system.  For example, in Adobe Access, the license acquisition process may include the acquisition of a license from a License Server, such as when a user system sends a request identifying the content (e.g., DRM metadata) and machine certificate to a License Server.  The License Server may issue a license containing the content encryption key to decrypt the content and the usage rules associated with that user's account.  If allowed by the license, the user system stores the license to enable offline access to the license and content; license caching allows later access without the need to reacquire a license each time the content is accessed.[18]  The Adobe Access DRM library is a module incorporated into Adobe Flash Player and Adobe AIR runtimes, which enables each runtime to communicate with the Adobe Access license server and play back protected content.  Offline viewing is supported by the module embedded within the Adobe AIR runtime.  "After registering and paying the publisher for the content, the user can access and download the content and associated AIR application from the publisher's website. Using the AIR application, the user can view the content offline during the permitted period."  Included in Adobe Flash Player and Adobe AIR are DRM APIs, which "initiate the workflow for playback of protected content. The runtime, through the Adobe Access module, contacts the license server.  The license server

_____

[18] Adobe Access 4.0 Overview, at 5.

authenticates the user, if necessary, and issues a license to allow playback of protected content. The runtime receives the license and decrypts the content for playback."[19]

68.     Adobe Access also provides for a graphical user interface associated with the license control utility to provide communication between a user and user accessible functions of the license functions mechanism, and the dynamic license database via the DRM library and Adobe Access APIs included within Adobe Flash and Adobe AIR.  Adobe documentation describes the workflows for implementation of features such as identity-based licensing requires entering a user identification and password within the Flash or AIR application.  As described above, Adobe Access includes objects and APIs allow for the display of license-related information (e.g., remaining days the user has for viewing content within a status bar), and Adobe documents describes and encourages this approach.  Adobe further notes the opportunity for up-selling by including provisions to purchase licenses for content:  "Because the content is packaged with usage rules and licensing information, protection always travels with the content.  If unlicensed consumers attempt to play the content, the policy embedded in the content redirects them so they can acquire a valid license for the content."[20]

69.     As described above, the dynamic license database is associated with the digital content file and stores storing information controlling operations of the file access control mechanism and license information controlling licensed use of the digital content, i.e., the Adobe Access policies embodied in the licenses that are embedded into content files or provided by a License Server and subsequently stored on a user machine.

---

[19] "Using Digital Rights Management," Actionscript 3.0 Developer's Guide, *available at* http://help.adobe.com/en_US/as3/dev/WS5b3ccc516d4fbf351e63e3d118676a5be7-8000.html (last updated Oct. 9, 2017).

[20] *E.g.*, Adobe Flash Access 4.0 Overview, at 6.

70.     By making, using, offering for sale, and/or selling products in the United States, and/or importing products into the United States, including but not limited to Adobe Access technology and software, Adobe has directly infringed and is directly infringing, literally or under the doctrine of equivalents, one or more claims of the '567 patent, including without limitation claim 1, in violation of 35 U.S.C. § 271(a).

71.     Furthermore, Adobe has directly infringed at least claim 1 because its employees and agents within the United States have downloaded and accessed digital content files prepared and distributed by Adobe and by other parties that satisfy all of the limitations of claim 1.  Additionally, Adobe has created digital content files in accordance with claim, such is in accordance with the development, testing, and quality assurance of the Adobe Access, Adobe Flash, Adobe AIR and Adobe Primetime products and services.  By way of example, Adobe's technical support personnel have accessed and controlled user systems and obtained digital content files prepared and distributed by Adobe customers and end users in connection with troubleshooting, diagnostics, and bug fixing.

72.     Adobe also has induced, and is now inducing, the infringement of at least claim 1 of the '567 patent under 35 U.S.C. § 271(b) by making, using, distributing, selling, and offering to sell the Adobe Access DRM technology and software to content providers, client application providers, and third-party software developers and end users of servers, software applications, web applications, digital content, and client devices that incorporate Adobe Access technology.  The use of Adobe Access-protected content on software applications, web applications and client devices constitutes direct infringement by such end users of at least claim 1 of the '567 patent.

73.     Adobe has actively encouraged and instructed, and is encouraging and instructing, content, client application, and device providers, and third-party software developers and end users

of software applications, web applications, digital content, and client devices incorporating Adobe

Access features, who are not licensed by plaintiff, to use Adobe Access components and other

Adobe-provided software and services to include Adobe Access DRM protection and playback

features in software applications, web applications, digital content, servers, and client devices to

control access to and the licensed use of digital content.  Adobe does so with the knowledge that the

induced acts constitute direct infringement by at least such end users of at least claim 1 of the '567

patent. Adobe's promotional materials, for example, instruct digital content providers, client

application providers, and device providers, and third-party software and device developers how to

incorporate and use Adobe Access software in applications, web applications, digital content,

servers, and client devices to control access to and licensed use of digital content, in a manner that

infringes at least claim 1 of the '567 patent.  Such use of Adobe Access technology remains subject

to Adobe's monitoring and control pursuant to the Adobe Access license terms.  Adobe knows and

intends that third-party content and distribution providers use Adobe Access technology, and knows

and intends that such providers' end users use Adobe Access in an infringing manner.

74.     Adobe possesses specific intent to encourage infringement.  Adobe has control over

the design and manufacture of Adobe Access and software for supported client applications and

environments, and possesses specific intent to cause infringement by the use of its Adobe Access

software to control access to and use protected digital content. Adobe's encouraging acts actually

resulted in direct patent infringement.

75.     By way of example, VUDU offers a "VUDUToGo" application that incorporates the

Adobe Access DRM technology through the Adobe AIR application framework.  In particular,

VUDUToGo provides a graphical user interface for downloading and accessing protected digital

content files, including in offline mode, such that said digital content files satisfy each element of claim 1.

76.     Adobe has also contributed to and is now contributing to the infringement of at least claim 1 of the '567 patent under 35 U.S.C. § 271(c) by selling and offering to sell, within the United States, Adobe Access and related software applications and services which are used to incorporate Adobe Access DRM technology into content files (e.g., by encoding digital audio and video files using Adobe Access technology), and to distribute, deploy, access and use such files in an infringing manner.  Adobe provides Adobe Access technology, software, and services to content providers, client application providers, and third-party software developers and to end users of software applications, web applications, digital content, and client devices incorporating Adobe Access software.  Adobe knows and intends that third party content and distribution providers use Adobe Access DRM features, and knows and intends that such providers' end users use Adobe Access in an infringing manner.

77.     The Adobe Access technology and protected digital content files are material parts of the claimed inventions of the '567 patent, and Adobe has knowledge that such technology and content files are especially made and adapted for use in infringing at least claim 1 of the '567 patent.

78.     There are no substantial non-infringing uses of the Adobe Access technology, Adobe Access protected content files, other than to control access to and license use of digital content according to license terms and policies stored in embedded license stores and dynamic license databases, in a manner that infringes at least claim 1 of the '567 patent.

79.     Adobe has had and does have knowledge of the '567 patent as alleged above and that its actions would lead to the infringement of the '567 patent.

80.     Adobe's infringement of the '567 patent has been and continues to be deliberate and willful, and, this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees pursuant to 35 U.S.C. §§ 284-285.

81.     As a result of Adobe's infringement of the '567 patent, ViaTech has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Adobe's infringement, but in no event less than a reasonable royalty with interest and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, ViaTech prays for judgment and seeks relief against Adobe as follows:

A.     For judgment that Adobe has infringed and/or continues to infringe one or more claims of the '567 patent, directly, and/or indirectly by way of inducement or contributory infringement;

B.     For a preliminary and permanent injunction against Adobe, its respective officers, agents, servants, employees, attorneys, parent and subsidiary corporations, assigns and successors in interest, and those persons in active concert or participation with them, enjoining them from infringement, inducement of infringement, and contributory infringement of the '567 patent, including but not limited to an injunction against making, using, selling, and/or offering for sale within the United States, and importing into the United States, any products and/or services that infringe the '567 patent;

C.     For judgment awarding ViaTech damages adequate to compensate it for Adobe's infringement of the patent-in-suit, including all pre-judgment and post-judgment interest;

D.      For judgment that Adobe has willfully infringed and continues to willfully infringe one or more claims of the patent-in-suit;

E.      For judgment that Adobe has infringed in bad faith and continues to infringe one or more claims of the patent-in-suit in bad faith;

F.      For judgment awarding enhanced damages pursuant to 35 U.S.C. § 284;

G.      For judgment imposing a mandatory future royalty payable on each and every product or service sold by Adobe in the future that is found to infringe the patent-in-suit and on all future products and services which are not colorably different from products found to infringe;

H.      For judgment awarding attorneys' fees pursuant to 35 U.S.C. § 285 or otherwise permitted by law;

I.      For judgment awarding costs of suit; and

J.      For judgment awarding ViaTech such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure ViaTech hereby demands a trial by jury of this action.

VIATECH TECHNOLOGIES, INC.

By its attorneys,

*/s/  Susan G. L. Glovsky*
Susan G. L. Glovsky (BBO# 195880)
susan.glovsky@hbsr.com
Lawrence P. Cogswell III, Ph,.D. (BBO#664386)
lawrence.Cogswell@hbsr.com
Hamilton, Brook, Smith & Reynolds, P.C.
155 Seaport Blvd.
Boston, Massachusetts  02210
Tel: (617)-607-5900
Fax: (978) 341-0136


Of counsel, *pro hac vice* to be filed:


Denise M. De Mory
Aaron R. Hand
Michael Zachary
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA 94063
Tel.: (650) 351-7248
Fax: (415) 426-4744
ddemory@bdiplaw.com
ahand@bdiplaw.com
mzachary@bdiplaw.com


Dated:  May 24, 2019